J. Ryan Mitchell (9362)
Mika Hillery (18414)
MITCHELL BARLOW & MANSFIELD, P.C.
9 Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
rmitchell@mbmlawyers.com
mhillery@mbmlawyers.com

Howard Kaplan*
Jed W. Glickstein*
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
howard@kaplangrady.com
jglickstein@kaplangrady.com
*Pro hac vice applications pending

Attorneys for Plaintiff

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| A.Z., by and through his guardians ANDREA ZOLMAN and STEVE ZOLMAN,<br><br>**Plaintiff,**<br><br>v.<br><br>ALPINE SCHOOL DISTRICT, RYAN BURKE, KATHY DRAPER, JOE HAYES, DAVID TURNER, and ALICIA DOE,<br><br>**Defendants.** | **COMPLAINT**<br><br>Case No. 2:24-cv-00051<br><br>**JURY TRIAL DEMANDED** |

Plaintiff A.Z., by and through his guardians, Andrea Zolman and Steve Zolman, and his attorneys at Kaplan & Grady LLC and Mitchell Barlow & Mansfield, P.C., complains of Defendants Alpine School District, Ryan Burke, Kathy Draper, Joe Hayes, David Turner, and Alicia Doe, and states as follows:

**INTRODUCTION**

1.      This case is about the repeated abuse of A.Z., a disabled child, by his school bus driver and the bus driver's aide.

2.      Disturbingly, this case is also about the Alpine School District's egregious failures to protect A.Z. from this abuse, even after District officials watched video of the abuse taking place. Despite the video evidence, the District and its officials did nothing to stop the abuse from happening again—and it did happen again.

3.      A.Z. is a nine-year-old boy who lives in Alpine, Utah. He was born with a congenital diaphragmatic hernia, which has caused intellectual and physical disabilities.

4.      From January through March 2022, A.Z. was repeatedly berated and abused by his bus driver and her aide, in full knowledge of Alpine School District officials.

5.      On March 24, 2022, the violence against A.Z. became a threat to A.Z.'s life when his bus driver violently restrained him by sitting on him, compressing his chest. A large adult sitting on a child's chest is appalling in any circumstance. For A.Z., who has significantly diminished lung capacity due to his disability, it was a mortal danger.

6.      When A.Z.'s father met A.Z. at his bus stop that day, A.Z. was obviously shaken and disturbed. This and other abuse harmed A.Z. physically and emotionally. His parents noted that his intellectual development was impaired from the trauma of being hurt by people who were employed to, above all else, keep him safe.

7.      Following the March 24 assault, A.Z.'s parents learned more about how his bus driver and her aide had regularly taunted and berated him. This had occurred even though A.Z.'s parents had previously raised concerns with District officials, including special education

administrators Ryan Burke and David Turner and transportation administrator Joe Hayes, about A.Z.'s treatment on the school bus.

8.      Although some aspects of A.Z.'s mistreatment are still unknown—in part because the District has refused to provide videos of the incidents involving A.Z. to his parents—it is now clear that school administrators were aware of the abuse but took no effective action to protect A.Z. and other disabled children entrusted to their care, discipline his abusers, or even inform A.Z.'s parents of the risks to their son.

9.      A.Z.'s experience reflects a district-wide failure to provide adequate resources for children with disabilities and special needs, and to provide appropriate oversight, support, and training to bus drivers, aides, and others. District officials have long been on notice of problems with busing and special education services but have failed to act. That includes Defendants in this case.

10.     Despite irrevocably breaching the trust put in them to protect children from harm, the District officials named as Defendants in this case have maintained their top leadership positions and have faced no consequences for their actions. Accountability is long overdue. Through this action, A.Z.'s parents hope to remedy some of the systemic deficiencies in the Alpine School District and prevent further incidents like those that gave rise to this suit.

**JURISDICTION AND VENUE**

11.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

12.     Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this district and a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## PARTIES

13.     Plaintiff A.Z. is the nine-year-old son of Andrea and Steve Zolman. He lives in Alpine, Utah, and attends the special needs program at Cedar Ridge Elementary, where he is currently in third grade.

14.     Andrea (Annie) Zolman and Steve Zolman are A.Z.'s parents and legal guardians.

15.     Defendant Alpine School District ("the District") is a public school district that provides educational services in the State of Utah, including at Cedar Ridge Elementary in the city of Cedar Hills. It is the largest school district in the state. The District receives federal funds. At all relevant times, the District oversaw a bus transportation program for its students and was responsible for hiring, training, supervising, and disciplining bus drivers and aides.

16.     Defendant Ryan Burke is the District's Director of Special Education. At all relevant times, he was responsible for creating, modifying, and implementing the District's special education policies and hiring, supervising, and training special education employees and personnel. At all relevant times, he acted under color of law and within the scope of his employment. Burke is sued in his individual capacity.

17.     Defendant Joe Hayes is the District's Director of Transportation. At all relevant times, he was responsible for creating, modifying, and implementing the District's transportation program and hiring, supervising, and training transportation employees and personnel. At all relevant times, he acted under color of law and within the scope of his employment. Hayes is sued in his individual capacity.

18.     Defendant David Turner is the Special Education Director - Elementary (Central Area), which includes Cedar Ridge Elementary. At all relevant times, he was responsible for implementing special education policies at Cedar Ridge. At all relevant times, he acted under color of law and within the scope of his employment. Turner is sued in his individual capacity.

19.     Defendant Kathy Draper is a former bus driver for the District. At all relevant times, she acted under color of law and within the scope of her contract with the District. Draper is sued in her individual capacity.

20.     Defendant Alicia Doe (last name unknown) is a former aide on the school bus driven by Draper. At all relevant times, she acted under color of law and within the scope of her contract with the District. Doe is sued in her individual capacity.

## ALLEGATIONS

### A.     A.Z. And His Family Battle His Congenital Condition

21.     A.Z. was born with a severe congenital diaphragmatic hernia ("CDH"), a rare condition that occurs when the diaphragm develops a hole during gestation. The hole allows abdominal organs like the stomach and liver to move from the abdomen into the chest cavity, causing a variety of serious complications for the developing baby.

22.     In A.Z.'s case, his severe CDH meant that his lungs had no room to grow and were substantially underdeveloped at birth. When this condition was discovered at the 20-week ultrasound appointment, doctors told Annie and Steve that their baby's chances of survival were just 20 to 30 percent.

23.     A.Z. beat the odds. He underwent his first surgery just six hours after his birth and spent the next several weeks on an extracorporeal membrane oxygenation unit to give his lungs as much time to develop as possible. After 90 days in the neonatal intensive care unit, A.Z. was discharged from the hospital and returned home to be with his family.

24.     A.Z. has made great strides considering his original prognosis, but he remains disabled. He has difficulty breathing and tires more easily than others his age. For example, when A.Z. has periods of extended laughter, his lips may become slightly cyanotic (or purple), reflecting low oxygen levels in his blood.

25.     A.Z. also has intellectual disabilities, a common comorbidity, which include apraxia (speech delays) and global delays. He often uses gestures to communicate his wants, feelings, and needs. At the time of the incidents described below, A.Z. was speaking at roughly a two-year-old level and his motor skills were similarly limited.

26.     In addition, A.Z. has asthma, anaphylactic allergies, often becomes very ill after contracting a respiratory illness, has difficulty eating, and is at risk for conditions like scoliosis.

27.     Although CDH is a serious condition, there is growing awareness that, with proper care, children with CDH can live full and rewarding lives. A.Z. and his family are a testament to this reality. A.Z. is a beloved son and younger brother who loves being outside, watching football, and listening to music. In other words, although A.Z. has CDH and therefore certain delays and challenges that, for example, limit his verbal expression and physical endurance, he is above all a regular kid. He enjoys playing, learning, and being with people who treat him with respect and kindness, and he suffers when treated with cruelty and abuse.

28.     To help other families facing the challenges of CDH, Annie and Steve founded a nonprofit called Tiny Hero (https://www.tinyhero.org) in 2015. The organization shares the stories of dozens of families who, like the Zolmans, have worked with love and hope to create rewarding and full lives for children with CDH. Tiny Hero also provides educational modules for families facing CDH, educates doctors about how to approach the diagnosis with their patients, and provides financial assistance to families who must temporarily relocate to get their children the care they need.

**B.      A.Z. Relies On The District For Safe Transportation**

29.      In 2021, A.Z. enrolled as a first grader in the Life Skills class at Cedar Ridge Elementary, an elementary school in Cedar Hills, Utah, in the District.

30.      The District hires bus drivers and aides to transport students to and from its schools. The District is responsible for training, supervision, and discipline in its bus program.

31.      Students with disabilities take a separate bus from nondisabled students.

32.      Beginning in August 2021, A.Z. took a bus to school three times per week and home from school five times per week.

33.      Draper was the driver assigned to A.Z.'s bus.

34.      Doe worked as Draper's aide on the bus.

35.      Draper and Doe were familiar with A.Z.'s disabilities. On information and belief, Draper and Doe knew that A.Z.'s disability inhibited his ability to breathe.

**C.      A.Z. Is Abused And Mistreated**

36.      In January 2022, Draper and Doe began complaining to the Zolmans' caregiver that A.Z. was misbehaving on the bus.

37.      A few days later, Annie Zolman saw Draper and Doe berate A.Z. while putting him into his seat. When Annie told Draper that it was not appropriate to speak like that in front of A.Z., Draper did not respond. Annie saw Doe angrily throw her coat onto A.Z. as the bus drove away.

38.      The Zolmans raised concerns with the District about Draper and Doe's behavior and about the special education training drivers like Draper were supposedly receiving.

39.     A.Z.'s bus is equipped with video cameras. After talking to Dot Dean, a supervisor in the District's transportation department, the Zolmans asked to review video footage of Draper and Doe's interactions with A.Z.

40.     Dean agreed that Draper and Doe's behavior was inappropriate, but she said it would be difficult for the Zolmans to review the footage. Dean promised to review it herself instead.

41.     For several weeks, the Zolmans waited to learn what the videos showed. No one contacted the Zolmans to inform them that they had reviewed the footage—much less that it showed evidence of A.Z. being abused.

42.     Around this time, A.Z. began displaying increasing agitation when getting off the bus. Neither the Zolmans nor their caregiver could figure out why.

43.     Two weeks later, having heard nothing from the District, Annie contacted Dean again. Dean admitted to Annie that she had watched video footage and was concerned by how Draper and Doe were acting toward A.Z on the bus.

44.     Dean told Annie that Draper and Doe "needed training," but explained that training could not be provided because Draper had not returned repeated phone calls from the District. Remarkably, despite their failures to respond, Draper and Doe were permitted to continue as driver and aide on the bus and entrusted with the safety of A.Z. and his schoolmates.

45.     When Annie asked how the District could employ someone to drive children who would not return the District's calls, especially when there was video evidence of misconduct, Dean referred Annie to special education director Joe Hayes.

46.     Without assurances from the District that sufficient safeguards had been implemented to ensure A.Z.'s safety, the Zolmans had little choice but to pull A.Z. off the bus and arrange for him to be driven separately to and from school.

47.     Arranging for A.Z. to be individually transported to and from school every day was difficult for the Zolmans in all the ways one would expect it to be for a working family with six children. Being forced off the bus was not only an inconvenience for the family, but a blow to A.Z.'s confidence and independence.

48.     On February 16, the Zolmans contacted school officials, including transportation supervisor Ryan Burke, special education director Joe Hayes, and special education director David Turner, to discuss the situation. Annie again expressed alarm that the District had been unable to contact Draper and had not taken any further action to protect A.Z. and others while Draper and Doe ignored its phone calls. Annie asked why the District had not stepped in to prevent Draper and Doe from transporting children.

49.     In response to the Zolmans' message, Burke attempted to minimize the situation. He acknowledged that the District had reviewed video footage showing Draper and Doe acting inappropriately and that further training was needed.

50.     When Annie asked Burke directly whether Draper and Doe were capable of working with special needs kids, Burke assured her that they were. Based on what he and other District officials knew at the time, this was a dangerous and self-serving lie.

51.     Burke, Hayes, and Turner did not offer any explanation as to why the District had taken no action to remove or train Draper and Doe or do anything else to protect A.Z. and other children in their care.

52.     Upon information and belief, prior to this conversation, the District had already reviewed additional video footage and seen more instances of abusive behavior by Draper and Doe toward A.Z. This was more than enough information to require greater supervision and discipline, including immediate termination or suspension. Yet the District did nothing. Draper and Doe were not disciplined, and the Zolmans (and other parents) were kept in the dark about what the District officials had learned.

**D.      A.Z.'s Abuse Escalates Due To The District's Egregious Failure To Act**

53.     In late February, District administrators reached out to the Zolmans about restarting bus services. The administrators said they had reviewed additional video footage from past bus rides and claimed that the situation had improved. They assured the Zolmans that A.Z.'s well-being was a priority.

54.     Relying on these representations, the Zolmans resumed using the District's transportation services. But just a short time later, the Zolmans learned of an even more disturbing incident.

55.     On March 24, 2022, A.Z. took the bus home from school. According to Draper, A.Z. was misbehaving during the ride to his stop. Showing utter disregard for A.Z.'s safety, Draper physically sat on top of A.Z. to "restrain" him.

56.     For any child, being treated this way by an adult authority figure would be frightening and painful. But due to A.Z.'s underdeveloped lungs and limited breathing capacity, Draper's actions on March 24 were also extraordinarily dangerous.

57.     When Steve Zolman met A.Z. at the bus stop, A.Z. was obviously distraught. Because of his disability, however, A.Z. was unable to tell his father precisely what had happened.

58.     Though A.Z. was visibly upset when he got off the bus, neither Draper nor Doe said anything to Steve to explain the situation. Both were noticeably cold and distant.

59.     Later that evening, Annie Zolman called Draper to ask what had happened. Draper told Annie that A.Z. was being "difficult" and admitted that she had sat on A.Z. to restrain him. Annie was shocked and appalled and asked Draper twice if she had really sat on her son; both times, Draper admitted that she had.

60.     Annie also expressed outrage that A.Z. was being shamed and that Draper and Doe had been aggressive and hostile to him on many occasions. Draper admitted, "I know, I tell [Doe] not to do that, and she keeps doing it anyway."

**E.      The Zolmans Learn More About the Scope of the District's Misconduct**

61.     The Zolmans were outraged by what they learned on March 24—especially because school administrators had just encouraged Steve and Annie to put A.Z. back on the bus, assuring them A.Z. would be safe.

62.     On March 25, Annie emailed Burke, Hayes, and Turner about Draper and Doe's outrageous conduct. Again, the administrators deflected and minimized the situation, claiming, in response to Annie's description of abuse admitted by Draper, that videos had shown "great changes" in Draper and Doe's behavior.

63.     The Zolmans demanded to see the videos so they could determine for themselves the extent of the misconduct. They also demanded to know who trained Draper and Doe, when, and how, as well as who at the District had reviewed the footage of the incidents that had supposedly prompted further training. District administrators never answered these questions.

64.     Hayes and Burke eventually allowed the Zolmans to view just three or four video segments on April 19, initially insisting on using a very small screen. The Zolmans were not

allowed to make copies of the videos and had to repeatedly ask administrators to turn up the volume so they could hear what was happening. It quickly became apparent why District officials were reluctant to share these clips.

65. In several of the videos, Draper and Doe berated A.Z. aggressively. In one, for example, Draper proclaimed that she wished that she could throw A.Z. off the bus. At least one video shows Doe forcibly moving A.Z. for no apparent reason.

66. In the video of the March 24 incident, the Zolmans could hear Doe warn Draper not to sit on A.Z., stating, "Kathy, you're really heavy!" Draper responded that she would not get up until A.Z. said "I'm done" or "I'll stop." Of course, A.Z. could not say these things, given that he was largely non-verbal, struggling to breathe, and out of reach of the inhaler kept in his backpack.

67. While these shocking videos played, Hayes and Burke said nothing to justify Draper's behavior or their own failure to address the situation. Horrified, the Zolmans stood up and walked out of the room. Hayes and Burke remained silent.

68. That night, Annie texted Draper to tell her how devastating it was to see the way that Draper and Doe had treated her son. Draper, apparently thinking that she was forwarding Annie's text to Doe, responded to Annie: "What a bitch, I can't believe she sent this to me."

69. The Zolmans later learned that administrators had seen videos of A.Z. being berated on the bus as early as February 2022. That was more than a month before Draper risked A.Z.'s life by sitting on him.

70. To this day, the District, led by Hayes, Burke, and Turner, has refused to provide the Zolmans with videos related to their son, concealing the full scope of their misconduct.

71.     In an astonishing dereliction of duty, the District took no meaningful action to notify other parents of children who rode the bus with A.Z. about any issues with Draper or Doe.

72.     Because the District and its officials took no action to inform parents about the risks to their children or to protect them from those risks, Annie took it upon herself to ensure that parents of other kids on A.Z.'s bus were made aware of the dangers posed by Draper and Doe, who were still working for the District. The parents she spoke with had worrying stories of their own.

73.     In October 2022, following a police investigation, Cedar Hills City Prosecutor charged Draper under § 76-5-109(3)(A) of the Utah Criminal Code for intentional or knowing infliction of physical injury upon a child. Draper was later convicted of that offense.

**F.      The Impact of the District's Abuse On A.Z.**

74.     After seeing the video evidence of their child being abused on a school bus, the Zolmans immediately withdrew A.Z. from the District's transportation program.

75.     A.Z. has suffered significantly from Defendants' actions. In addition to the pain and humiliation he suffered during the abuse, the Zolmans have observed that the incident inhibited A.Z.'s development and caused other long-term consequences.

76.     As a result of Defendants' assault and abuse, A.Z. suffered and continues to suffer significant emotional damages. As the abuse progressed, A.Z.'s behavioral responses to everyday situations and transitions worsened, his speech development slowed, and he lacked confidence to learn new skills.

**G.      The District's History of Mistreating Disabled Children**

77.     The abuses A.Z. suffered at the hands of his bus driver and her aide in 2022 are part of a pattern and practice of misconduct toward disabled children in the District. In 2018, for

instance, a bus driver punched, slapped, restrained, and verbally abused a 16-year-old disabled student at Horizon School, another school in the District. Video of the incident captured the student screaming and crying as she was restrained. The student's legal guardian filed suit against the District, naming and serving Director of Special Education Ryan Burke as a defendant, among others. *See Turner v. Alpine School District*, No. 19-cv-870 (D. Utah).

78.     In 2017 and 2018, another disabled boy in the District was improperly restrained by aides and teachers in a device called a Rifton chair. Again, the student's legal guardian filed suit, naming and serving Burke, among others. *See Keller v. Alpine School District*, No. 19-cv-874 (D. Utah).

79.     These lawsuits and the events that triggered them indisputably put administrators on notice—if they were not on notice already—of the pressing need to hire reasonably conscientious employees and to properly train them on appropriate ways to interact with and respond to issues with disabled children, to closely monitor employees entrusted with children with special needs, and to intervene quickly when concerns were raised. Based on the District's failure to take any meaningful action before A.Z. was the victim of preventable abuse, however, it is clear that the District was indifferent to the safety of its disabled students, despite the known risks.

80.     According to the District's discipline policy, physical restraint is only permitted when a student "presents an immediate/imminent danger of physical violence/aggression toward self or others likely to cause serious physical harm." The policy requires that personnel who work with students are trained on effective alternatives to physical restraint. Moreover, parents must be informed when personnel physically restrain a student, and any incident where a student is restrained must be documented. These lawsuits, Draper's abuse of A.Z., and the District's

response after learning of that abuse, show that the District does not properly train and supervise its personnel. From A.Z.'s situation, it is also clear that District officials are willing to cover up abuse to protect their own jobs and positions of authority.

81. More recently, a new set of problems has come to light in the Title IX context. In September 2023, the U.S. Department of Education's Office for Civil Rights concluded a compliance review for the school years 2017 to 2020 and concluded that the District had violated Title IX of the Education Amendments of 1972 and its implementing regulations in several ways.

82. The Department of Education ("DOE") review identified concerning deficiencies in administration, training, and communication in the District. And several of the episodes described in the letter shared notable similarities to A.Z.'s abuse.

83. According to the DOE, for example, the District failed to adequately investigate an employee-to-student sexual assault involving a bus employee in 2017. Based on the video footage and the employee's admission to the conduct, the Director of Transportation informed the employee that he would recommend that Human Resources suspend the employee without pay for four days, place him on probation, and move him to a new bus route. The District was unable to confirm whether the recommended disciplinary action was actually imposed on the employee.

84. Another incident discussed in the DOE report involved a student who initiated sexual contact with a disabled student in 2018. As in this case, records showed that the District's Transportation Department had observed video footage of the incident, but failed to communicate the outcome of the investigation to the female student or her parent.

85. In 2021, dozens of parents wrote to the District to complain that it discriminates against children with special needs.

86.     A.Z.'s parents have devoted their lives to advocating for children with special needs to receive the best care and be treated with compassion. This mission, which they tirelessly push forward through their nonprofit, Tiny Hero, is what drives them to pursue this lawsuit on A.Z.'s behalf against the District and District employees who have repeatedly disregarded the safety and dignity of A.Z. and other disabled children.

**COUNT I**
**42 U.S.C. § 12132 – Americans with Disabilities Act**
**Defendant Alpine School District**

87.     Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

88.     Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

89.     A.Z. is a qualified individual with a disability within the meaning of the ADA.

90.     The District is a public entity within the meaning of the ADA.

91.     The District's school bus program is a program or activity within the meaning of the ADA.

92.     The District, through its agents, repeatedly berated, ridiculed, and physically harmed A.Z. on the basis of his disability while he participated in its school bus program. The District knew that this abuse was occurring but did nothing to prevent the discrimination.

93.     In addition, the District knew from prior instances of discrimination against A.Z. and other disabled children that violations of A.Z.'s rights under the ADA by its agents were likely, but it failed to act on that likelihood.

94.     In failing to take any steps to protect A.Z., as described herein, the District effectively prohibited A.Z. from participating in the school bus program.

95.     As a result of the District's discrimination, A.Z. suffered injuries, including physical injuries and severe emotional distress.

## COUNT II
### 29 U.S.C. § 794(a) – Rehabilitation Act
### Defendant Alpine School District

96.     Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

97.     The Rehabilitation Act prohibits a qualified individual with a disability from being excluded from participating in, being denied the benefits of, or being subjected to discrimination in any program or activity receiving federal financial assistance.

98.     A.Z. is a qualified individual with a disability within the meaning of the Rehabilitation Act.

99.     At all times relevant to A.Z.'s claims, the District received financial assistance within the meaning of the Rehabilitation Act.

100.    The District's school bus program is a program or activity within the meaning of the Rehabilitation Act.

101.    The District, through its employees or agents, repeatedly berated, ridiculed, and physically harmed A.Z. on the basis of his disability while A.Z. was participating in its school bus program. the District knew that this abuse was occurring, but did nothing to prevent the discrimination.

102.    In addition, the District knew from prior instances of discrimination against A.Z. and other disabled children that violations of A.Z.'s rights under the ADA by its agents were likely, but it failed to act on that likelihood.

103.    By failing to take any steps to protect A.Z., as described herein, the District effectively prohibited A.Z. from participating in the school bus program to the same degree as students who were not disabled.

104.    As a result of the District's discrimination, A.Z. suffered injuries, including physical injuries and severe emotional distress.

**COUNT III**
**42 U.S.C. § 1983 – Due Process (Fourteenth Amendment)**
**Defendants Draper, Doe, Burke, Hayes, Turner, and Alpine School District**

105.    Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

106.    As adults and agents of the District, Draper and Doe had authority over A.Z.

107.    In the manner described more fully above, Draper and Doe brutally and inhumanely abused that authority by physically and verbally assaulting A.Z., who they knew had multiple intellectual and physical disabilities. Defendants' actions were so malicious and sadistic that they shock the conscience.

108.    Draper and Doe's misconduct was not an isolated incident. Rather, it was part of a policy or practice whereby District personnel and agents with responsibility for providing disabled children in the District various services, including transportation services, abused their positions of power and abused or mistreated the disabled children in their care.

109.    Senior leaders in the District, including Burke, Hayes, and Turner, were aware of this practice of brutal abuse of power prior to the abuse of A.Z., but took no meaningful action to ensure that the disabled children under their care, like A.Z., were protected from harm.

110.    Specifically, the policy or practice of abuse was allowed to flourish because the District, which is responsible for the provision of services to disabled children like A.Z., tolerated and thereby encouraged the very type of misconduct at issue in this case, failed to

provide adequate training and supervision of District employees and agents, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, the District violated A.Z.'s rights by maintaining policies and practices that enabled and encouraged the foregoing constitutional violations.

111.     As described more fully above, Burke, Hayes, and Turner were responsible for maintaining the District's policies regarding special education and transportation, respectively.

112.     As described more fully above, Burke, Hayes, and Turner were aware of policies or practices pursuant to which District personnel and agents with responsibility for providing disabled children in the District various services, including transportation services, abused their positions of power and abused or mistreated the disabled children in their care.

113.     Despite repeated instances of notice, Burke, Hayes, and Turner took no meaningful action to address this policy or practice of abuse. Instead, they effectively tolerated the policy or practice, thereby encouraging the very type of misconduct at issue in this case, and failed to provide adequate training and supervision, including disciplining prior instances of similar misconduct. In this way, Burke, Hayes, and Turner violated A.Z.'s rights with conduct that shocks the conscience and caused the foregoing constitutional violations.

114.     As a direct and proximate result of Defendants' egregious misconduct, A.Z.'s rights were violated, and he suffered severe physical and emotional harm. Among other things, A.Z. suffered substantial setbacks in the developmental achievements that A.Z. and his parents had worked so hard to achieve.

115.     A.Z.'s injuries were caused by agents and employees of the District, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices when engaging in the misconduct described above.

## COUNT IV
### 42 U.S.C. § 1983 – Excessive Force (Fourth Amendment)
### Defendants Draper, Doe, Burke, Hayes, Turner, and Alpine School District

116.     Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

117.     There was no legitimate need for Draper to restrain or use force against A.Z. in the manner that she did. Thus, the force that Draper used by sitting on A.Z. was objectively unreasonable.

118.     There was also no legitimate need for Doe to use force to compel A.Z. to move. Thus, the force that Doe used was objectively unreasonable.

119.     Draper and Doe's misconduct was not an isolated incident. Rather, it was part of a policy or practice whereby District personnel and agents with responsibility for providing disabled children in the District various services, including transportation services, abused their positions of power and physically abused or mistreated the disabled children in their care.

120.     Senior leaders in the District, including Burke, Hayes, and Turner, were aware of this practice of physical abuse prior to the abuse of A.Z., but took no meaningful action to ensure that disabled children under their care, like A.Z., were protected from harm. Instead, they tolerated the practice, effectively condoning the misconduct.

121.     Specifically, the policy or practice of physical abuse was allowed to flourish because the District, which is responsible for the provision of services to disabled children like A.Z., tolerated and thereby encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of District employees and agents, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, the District violated A.Z.'s rights by maintaining policies and practices that enabled and encouraged the foregoing constitutional violations.

122.    As described more fully above, Burke, Hayes, and Turner were responsible for maintaining the District's policies regarding special education and transportation, respectively.

123.    As described more fully above, Burke and Hayes were aware of policies or practices whereby District personnel and agents with responsibility for providing disabled children in the District various services, including transportation services, abused their positions of power and physically abused or mistreated the disabled children in their care.

124.    Despite repeated instances of notice, Burke, Hayes, and Turner took no meaningful action to address the policy or practice of abuse. Instead, they effectively tolerated the policy or practice, thereby encouraging the very type of misconduct at issue in this case, and failed to provide adequate training and supervision, including disciplining prior instances of similar misconduct. In this way, Burke, Hayes, and Turner directly violated A.Z.'s rights.

125.    As a result of the excessive use of force against A.Z., A.Z. suffered injuries, including but not limited to physical injuries and severe emotional distress. Among other things, A.Z. suffered substantial setbacks in the developmental achievements that A.Z. and his parents had worked so hard to achieve.

126.    A.Z.'s injuries were caused by agents and employees of the District, including but not limited to the individually named Defendants, who acted pursuant to the foregoing policies and practices in engaging in the misconduct described above.

**COUNT V**
**42 U.S.C. § 1983 – Failure to Intervene**
**(Fourth Amendment and Fourteenth Amendment)**
**All Individual Defendants**

127.    Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

128.    In the manner more fully described above, each of the Individual Defendants had a reasonable opportunity to prevent the violation of A.Z.'s constitutional rights had they been so inclined, but they failed to do so.

129.    Defendants' failures to act were done intentionally, with malice, or with reckless indifference to A.Z.'s rights.

130.    As a direct and proximate result of the Individual Defendants' failures to intervene, A.Z.'s rights were violated and he experienced injuries, including but not limited to physical injuries and severe emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff A.Z., by and through his guardians Andrea Zolman and Steve Zolman, hereby respectfully requests that this Court enter a judgment in his favor and against Defendants Alpine School District, Ryan Burke, Kathy Draper, Joe Hayes, David Turner, and Alicia Doe, awarding compensatory damages, punitive damages, attorneys' fees and costs, and any other relief that this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff A.Z., by and through his guardians Andrea Zolman and Steve Zolman, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: January 19, 2024                           Respectfully submitted,

                                                  /s/ *J. Ryan Mitchell*

| | |
|---|---|
| Howard Kaplan (PHV application pending) | J. Ryan Mitchell (9362) |
| Jed W. Glickstein (PHV application pending) | Mika Hillery (18414) |
| KAPLAN & GRADY LLC | MITCHELL BARLOW & MANSFIELD, P.C. |
| 2071 N. Southport Ave., Ste. 205 | 9 Exchange Place, Suite 600 |
| Chicago, IL 60614 | Salt Lake City, Utah 84111 |
| (312) 852-2184 | Telephone: (801) 998-8888 |
| howard@kaplangrady.com | rmitchell@mbmlawyers.com |
| jglickstein@kaplangrady.com | mhillery@mbmlawyers.com |

*Attorneys for Plaintiff*
