J. Ryan Mitchell (9362)
Mika Hillery (18414)
MITCHELL BARLOW & MANSFIELD, P.C.
9 Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
rmitchell@mbmlawyers.com
mhillery@mbmlawyers.com

Howard Kaplan (pro hac vice)
Sarah Grady (pro hac vice)
Jed W. Glickstein (pro hac vice)
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205
Chicago, IL 60614
(312) 852-2184
howard@kaplangrady.com
sarah@kaplangrady.com
jglickstein@kaplangrady.com

*Attorneys for Plaintiff*

---

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| A.Z., by and through his guardians ANDREA ZOLMAN and STEVE ZOLMAN, **Plaintiff,** v. ALPINE SCHOOL DISTRICT, RYAN BURKE, KATHY DRAPER, JOE HAYES, DAVID TURNER, and ALICIA FRYER, **Defendants.** | **PLAINTIFF'S RESPONSE TO THE DISTRICT DEFENDANTS' PARTIAL MOTION TO DISMISS** Case No. 2:24-cv-00051 District Judge Ted Stewart Magistrate Judge Daphne A. Oberg |

Plaintiff A.Z., by and through his guardians, Andrea (Annie) Zolman and Steve Zolman, and his attorneys at Kaplan & Grady LLC and Mitchell Barlow & Mansfield, P.C., hereby responds to Defendants Alpine School District, Ryan Burke, Joe Hayes, and David Turner's Partial Motion to Dismiss, stating as follows:

## INTRODUCTION

The Alpine School District and its senior officials—Ryan Burke, Joe Hayes, and David Turner (together, the "District Defendants")—knew that A.Z., a disabled child, was being abused by his school bus driver and the bus driver's aide. They did nothing to stop it. Even after Burke, Hayes, and Turner watched video footage of the mistreatment, they failed to discipline the perpetrators and assured A.Z.'s parents that their son would be safe on the bus. Not only were Burke, Hayes, and Turner aware of A.Z.'s abuse, but District officials had long been on notice about broader problems with the District's bussing and special education services and the deficient policies and practices that allowed these problems to take root. Through this action—brought on their son's behalf—A.Z.'s parents Annie and Steve Zolman seek to hold the District and the involved District employees accountable for their conduct.

The operative complaint asserts five claims based on the Americans with Disabilities Act, the Rehabilitation Act, and the U.S. Constitution. Dkt. 21 ("Am. Compl."). The District Defendants have moved to dismiss all but one. Dkt. 26 ("Mem.").[1] In doing so, however, the District Defendants repeatedly misapply the federal pleading standard and the substantive law. Indeed, most of the key cases in the District Defendants' motion are summary judgment cases, which apply a fundamentally different standard. The District Defendants also seek qualified

---

[1] The District Defendants do not move to dismiss Plaintiff's claim that Alpine School District is responsible for violations of A.Z.'s Fourteenth Amendment rights. *See* Am. Compl. ¶ 110; Mem. 25 (moving to dismiss only as to the "Individual District Defendants").

immunity for their misconduct, even though it has been clearly established for decades that school officials are responsible for ensuring the safety of children, especially the most vulnerable children, in their care, and that failure to do so through the maintenance of deficient policies and practices is grounds for liability.

In sum, the Court should deny the District Defendants' motion in full. This case should move forward to discovery on all claims.

## BACKGROUND

A.Z. was born with a severe congenital diaphragmatic hernia, a rare and dangerous condition that caused serious and lasting complications. Am. Compl. ¶ 21. Among other things, A.Z. has difficulty breathing and limited verbal and motor skills. *Id.* ¶¶ 24-26. At all times relevant to this lawsuit, A.Z. was eight years old but functioned at roughly the level of a two-year-old. *Id.* ¶ 25.

In 2021, A.Z. enrolled as a first grader in an Alpine School District elementary school. *Id.* ¶ 29. A.Z. took a bus to or from school eight times per week. *Id.* ¶ 32. In January 2022, Annie Zolman saw A.Z.'s bus driver, Kathy Draper, and bus driver's aide, Alicia Fryer, berating A.Z. while putting him into his seat. *Id.* ¶ 38. Annie immediately raised concerns with the District about this behavior. *Id.* The Zolmans asked to review video footage from the bus, but a District official, Dot Dean, evaded their requests, assuring them she would review the footage instead. *Id.* ¶¶ 39-40. As the Zolmans waited, A.Z. displayed increasing agitation when he got off the bus. *Id.* ¶ 42.

After two weeks, Annie reached out to Dean again. *Id.* ¶ 43. Dean told her that the footage was concerning. *Id.* Dean opined that Draper and Fryer needed training, but explained that Draper would not return the District's phone calls. *Id.* ¶ 44. Remarkably, despite the District's inability to even contact Draper and Fryer, the District permitted them to continue working on the bus with

A.Z. and other vulnerable students. *Id*. Without assurances from the District about A.Z.'s safety, the Zolmans had little choice but to pull A.Z. from the bus program. *Id.* ¶ 46.

On February 16, 2022, the Zolmans contacted District officials, including Director of Special Education Ryan Burke, Director of Transportation Joe Hayes, and the Special Education Director for A.Z.'s school, David Turner, to discuss the situation. *Id.* ¶¶ 16-18, 48. At the time of this contact, the District officials had reviewed video footage showing multiple incidents of abusive behavior by Draper and Fryer toward A.Z. *Id.* ¶ 52. Although Burke acknowledged that the footage showed Draper and Fryer acting inappropriately, District officials did not discipline either employee, nor did they tell the Zolmans (or other parents) about the abuse. *Id.* ¶ 48.

Later that month, District officials informed the Zolmans that they had reviewed additional footage, the situation had improved, and A.Z. would be safe taking the bus. *Id.* ¶¶ 53, 61. Based on these representations, the Zolmans resumed using District transportation services. *Id.* ¶ 54.

On March 24, 2022, A.Z. took the bus home from school. *Id.* ¶ 55. When Steve met A.Z. at the bus stop, A.Z. was obviously distraught but, due to his disabilities, unable to tell his parents what happened. *Id.* ¶ 57. When Annie called Draper that evening to ask what went wrong, Draper stated that she had sat on A.Z. to restrain him because he was being "difficult." *Id.* ¶ 59. Especially due to A.Z.'s underdeveloped lungs and limited breathing capacity, Draper's actions were dangerous. *Id.* ¶ 56. By restraining A.Z. in this manner, she evinced an utter disregard for the child's safety. *Id.* The Zolmans, outraged by what they had learned, emailed Burke, Hayes, and Turner to discuss Draper's actions. *Id.* ¶ 61.

At this point, the District finally allowed the Zolmans to view video footage of their son, which revealed further instances of abuse. *Id.* ¶ 63. For example, in one video Draper proclaimed that she wished that she could throw A.Z. off the bus, and in another Fryer forcibly moved A.Z.

for no apparent reason. *Id.* ¶ 66. The Zolmans immediately withdrew A.Z. from the District's transportation program. *Id.* ¶ 74. As a result of Defendants' misconduct, A.Z.'s development was inhibited, and he continues to suffer significant emotional damages. *Id.* ¶¶ 74-75.

On behalf of their son, the Zolmans sued the District Defendants, Draper, and Fryer, seeking damages and injunctive relief. The operative complaint has five different claims. Count I alleges that the District violated the Americans with Disabilities Act by effectively excluding A.Z. from participation in the school bus program. *Id.* ¶¶ 87-95. Count II alleges that the District violated the Rehabilitation Act for the same reason. *Id*. ¶¶ 96-104. Counts III and IV allege that Defendants violated A.Z.'s rights under the Fourteenth Amendment and Fourth Amendment, respectively. *Id.* ¶¶ 105-26. Finally, Count V alleges that the individual Defendants are liable for failing to intervene to prevent a violation of A.Z.'s constitutional rights. *Id*. ¶¶ 127-30.

## ARGUMENT

Federal pleading standards require "a plausible short and plain statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the motion to dismiss stage, a court should treat all well-pled allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Matney v. Barrick Gold of N. Am*., 80 F.4th 1136, 1144 (10th Cir. 2023). Dismissal for failure to state a claim is proper only where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

**I.     Plaintiff adequately pleads an ADA claim (Count I).**

Title II of the ADA, 42 U.S.C. § 12132, protects individuals with disabilities from discrimination by a public entity on the basis of their disabilities. "To state a claim under Title II, the plaintiff must allege that (1) he is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007). It is undisputed that A.Z. is a qualified individual with a disability and thus meets the first element of an ADA claim. *See* Mem. 19; Am. Compl. ¶ 89.

**A.  The District Defendants misconstrue the factual and legal basis for the claim.**

The District Defendants first argue that A.Z. is impermissibly trying to rely on a "failure to train" theory under the ADA. Mem. 19-20. That is wrong for several reasons.

To begin, A.Z.'s ADA claim is broader than a failure to train. A.Z. specifically alleges that District officials saw video footage of abusive or inappropriate behavior at least a month before Draper physically assaulted A.Z. *See, e.g.*, Am. Compl. ¶¶ 48-52, 69 (discussing administrators' failure to discipline, suspend, or reassign Draper or Fryer after viewing video of inappropriate conduct). Despite that knowledge, the District did not take any action to remove Draper or Fryer or otherwise protect the children in their care. *Id.* These allegations alone state a claim, separate from the District's failure to take steps to provide appropriate training.[2]

---

[2] In addition, courts in this Circuit recognize that public entities are vicariously liable for the acts of their employees who violate the ADA. *See, e.g.*, *A.V. through Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1067 (D. Colo. 2022) ("Absent any binding authority to the contrary from within the Tenth Circuit, the Court will follow the guidance from the other circuit courts which have concluded that Title II of the ADA provides for *respondeat superior* liability."); *Haulmark v. City of Wichita*, No. 21-CV-1182-EFM-TJJ, 2022 WL 1442844, at *6 (D. Kan. May 6, 2022) (calling vicarious liability under the ADA "unremarkable"); *Doe v. Bd. Of Cnty. Comm'rs*

ADA's failure-to-train allegations make the District Defendants' liability even more apparent. In arguing otherwise, the District Defendants rely on two cases—*J.V. v. Albuquerque Public Schools*, 813 F.3d 1289 (10th Cir. 2016), and *Turner v. Alpine School District*, No. 2:19-cv-870-TS, 2020 WL 2849964 (D. Utah June 2, 2020). *See* Mem. 19-20. Both are clearly distinguishable. The *J.V.* case—decided on summary judgment—turned on a lack of record evidence. *J.V.*, 813 F.3d at 1298. The *Turner* case dismissed a failure-to-train ADA claim after finding no well-pled allegations that the defendant was on notice about the possibility of abuse. *See Turner*, 2020 WL 2849964, at *3. In contrast to those cases, the complaint in this case offers robust allegations that plausibly suggest that the District was on notice of the need for additional training for transportation personnel, especially those who worked with children with disabilities, and Draper and Fryer in particular.

Among the specific allegations in the Complaint, District official Dot Dean personally told the Zolmans in early 2022 that based on bus footage, it was apparent that Draper and Fryer needed training. Am. Compl. ¶ 44. A.Z. further alleges that the District Defendants themselves saw the footage of Draper and Fryer mistreating A.Z. in January and February 2022. *Id.* ¶¶ 48-52, 69. Indeed, Burke acknowledged that Draper and Fryer needed "further training." *Id*. ¶ 49. A.Z. also alleges that District administrators were aware of video of another bus driver slapping, physically restraining, and verbally abusing a disabled student just a few years earlier, *id*. ¶¶ 77, 80, as well as similar incidents involving abuse by transportation employees or captured on transportation

---

*of Craig Cnty.*, No. 11-CV-0298-CVE-PJC, 2011 WL 6740285, at *2 (N.D. Okla. Dec. 22, 2011) ("While the Tenth Circuit has not explicitly addressed the issue of *respondeat superior* liability under Title II of the ADA, other circuits that have considered the question have unanimously held that a municipal employer is vicariously liable for the acts of its employees who violate Title II of the ADA."). Accordingly, the District can be held liable under a respondeat superior theory for the actions of Draper and Fryer, which plausibly amount to intentional discrimination. *See* p. 10 *infra*.

footage. *Id*. ¶¶ 82-84. In fact, one of the incidents referenced in the complaint is the *Turner* incident itself. *Id*. ¶ 77. Even if it were implausible *before* the incident in *Turner* that the District had notice of the risks that its bus drivers would act inappropriately without training, it is obvious that the District was on notice *after* that incident (including disturbing video footage of a driver) became public. *See* Chris Jones & Nadia Pflaum, KUTV, *Bus Driver, Who Struck Blind Student with Autism, Wasn't Trained for Special Needs Kids* (Nov. 10, 2019), https://news3lv.com/news/nation-world/beyond-the-books-disturbing-video-raises-questions-about-training.

These detailed allegations make it plausible that District officials were on notice of the need for additional training in 2022. At the pleading stage, no more is necessary to state a claim. *See Partridge v. Smith*, No. 17-cv-2941-CMA, 2020 WL 897653, at *12 (D. Colo. Feb. 25, 2020) (the burden of alleging notice at the pleading stage is "significantly lower at the motion to dismiss stage"); *accord T.C. v. Hempfield Area Sch. Dist.*, No. 17-cv-1507, 2018 WL 3707419, at *6 (W.D. Pa. Aug. 3, 2018) (rejecting the argument that a plaintiff, without the benefit of discovery, must offer specific facts about the challenged policy or policymaker to state a failure-to-train claim).[3]

### B.  Plaintiff alleges that he was denied access to the bus program.

A.Z. alleges that he was excluded from or denied the benefit of his school bus program because of his disability. Title II of the ADA was promulgated "to remedy a broad, comprehensive

---

[3] The District Defendants argue that these events could not have put the District on notice because they did not involve Draper or Fryer specifically. Mem. 21. But a defendant need not know that a specific employee is likely to commit misconduct to have the required notice for a failure-to-train claim. *See Estate of Jensen v. Duchesne Cnty.*, No. 2:17-cv-1031-DAK, 2019 WL 3288864, at *6 (D. Utah July 22, 2019) (explaining that, for supervisory liability in the analogous prison context, "courts do not focus on the risk to a specific inmate by a specific employee"). And while "allegations from complaints filed against [governmental] defendants *without more*," cannot provide sufficient notice for a failure to train argument, *Estate of Lobato ex rel. Montoya v. Correct Care Sols., LLC*, 2017 WL 1197295, at *8 (D. Colo. Mar. 31, 2017) (emphasis added; cited at Mem. 31), A.Z. has alleged "more" here. Indeed, as explained, the complaint includes allegations regarding the District's knowledge of a need to train Draper and Fryer in particular.

concept of discrimination against individuals with disabilities." *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 859–60 (10th Cir. 2003). Disabled individuals are entitled not only to physical access to public programs and services, but to "*meaningful* access." *See Robertson,* 500 F.3d at 1195 (citing *Chaffin*, 348 F.3d at 857) (emphasis in original). When A.Z. participated in the school bus program, he was repeatedly abused by staff, even after his parents complained to District officials, who witnessed the abuse with their own eyes. Because he was unable to ride the bus without being abused, A.Z. did not have "meaningful" access to the program. *See id.* These allegations easily satisfy the ADA's broad standard. None of the District Defendants' arguments to the contrary are availing.

First, the District Defendants argue that the ADA claim should be dismissed because A.Z. does not allege that he could not "attend school" or access "alternative means of transportation." Mem. 21-22. But the District Defendants do not cite any authority stating that a plaintiff excluded from a public program or service cannot bring a claim under the ADA if there are other programs or services from which they are not excluded. The ADA's broad prohibition on discrimination applies to *all* services, programs, and activities. *See* 42 U.S.C. § 12132. It is not limited to specific programs. *See Robertson,* 500 F.3d at 1199 (explaining the ADA applies to voluntary as well as mandatory programs).

The District Defendants also blame A.Z.'s parents, claiming that it was their "decision" to remove him from the bus program without "attempt[ing] to get A.Z. continued access to bus services." Mem. 22. But the ADA does not require a plaintiff to personally attempt to correct discriminatory conduct to state a claim. Regardless, the complaint alleges that Annie and Steve repeatedly *did* raise concerns with District administrators. Am. Compl. ¶¶ 36-51. One month later, the same administrators falsely assured Annie and Steve that the situation had improved. *Id*. ¶¶ 53-

60. Only after the Zolmans saw video of yet more abuse and learned that the administrators had been aware of the ongoing abuse and done nothing meaningful to address it, did they decide to remove A.Z. from the bus program. *Id*. ¶¶ 61-74.

Finally, the District Defendants argue that A.Z. was excluded from participating in the bus program "as a direct result of [his] conduct, unrelated to his disability"—in other words, that it was A.Z.'s own "behavior" that led to his exclusion. Mem. 22. But the complaint contains no allegations that A.Z. misbehaved or broke any rules on March 24, let alone to such a degree that Draper and Fryer's verbal and physical abuse was justified. Indeed, the District Defendants themselves profess to "regret" and "not condone the actions of Ms. Draper," and appear to have found her actions to be so inappropriate that they terminated her employment because of the incident. Mem. 8. Draper's conviction under Utah Criminal Code § 76-5-109(3) further belies the litigation-driven argument that A.Z. brought the abuse he suffered upon himself. Am. Compl. ¶ 73.

### C.  Plaintiff was denied the benefits of the bus program by reason of his disability.

Related to their prior argument, the District Defendants contend that the complaint does not allege that A.Z. was denied access to the bus program "by reason of" his disability. Mem. 22-23. In support, the District Defendants cite two summary judgment cases, *J.V.*, 813 F.3d at 1295, and *J.H. ex rel. J.P. v. Bernalillo Cnty.*, 806 F.3d 1255, 1257 (10th Cir. 2015), and assert that Draper acted "to avoid injury to [herself] and other children." Mem. 23. The District Defendants' argument fails because it asks the Court to make inferences *against* A.Z., which is prohibited at the motion-to-dismiss stage. *See Matney*, 80 F.4th at 1144. As just discussed, there are no allegations that A.Z. threatened others or broke any rules. And even if there were such allegations, the Court would have to read them in the light most favorable to the District Defendants, not the light most favorable to A.Z., to conclude that Draper's real motivation was student safety.

A.Z. alleges that Draper and Fryer "berated A.Z. aggressively," that Fryer "forcibly mov[ed] A.Z. for no apparent reason," and that Draper said "she wished that she could throw A.Z. off the bus." Am. Compl. ¶ 65. On March 24, 2024, Draper's own explanation for sitting on top of A.Z. was not that he was breaking any rules or endangering others, but that he was just "being 'difficult.'" *Id.* ¶ 59. Although Draper knew that A.Z. could not verbalize his distress due to his disability, Draper told Fryer "that she would not get up until A.Z. said 'I'm done' or 'I'll stop.'" *Id.* ¶¶ 35, 66. All reasonable inferences point to the conclusion that A.Z. was mistreated because Draper and Fryer had personal animosity for A.Z.'s behaviors and expressions characteristic of his disability. At the very least, A.Z.'s allegations make their animosity toward A.Z. because of his disabilities a plausible reason for their misconduct. *See Iqbal*, 556 U.S. at 678.

It is further plausible that Draper and Fryer singled A.Z. out because they knew that he did not have the verbal capacity to tell anyone about their contemptible (and, in Draper's case, criminal) treatment of him. *See* Am. Compl. ¶ 35. The absence of any alternative explanation for the abuse further supports an inference that it was prompted by A.Z.'s disability.

## II.     Plaintiff adequately pleads a Rehabilitation Act claim (Count II).

The Rehabilitation Act, 29 U.S.C. § 794, prohibits a qualified individual with a disability from being excluded from participating in, being denied the benefits of, or being subjected to discrimination in any program or activity receiving federal financial assistance. Courts typically evaluate claims under the Rehabilitation Act "identically" with claims under the ADA. *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1302 n.4, 1312 (10th Cir. 2021). The only differences are that a program or activity subject to the Rehabilitation Act must receive federal funding (conceded here) and a difference in the causation standard. *See id.*

The District Defendants argue that A.Z.'s allegations do not permit the inference that the discrimination was "solely by reason of" his disability. Mem. 24. But construing the allegations in

A.Z.'s favor, is it entirely plausible that Draper and Fryer berated and abused A.Z. solely because he is disabled. The complaint does not allege any other reason that A.Z.'s actions would warrant restraint, harassment, or any other misconduct by Draper and Fryer. For that reason, the motion to dismiss the Rehabilitation Act claim should be denied. *See Forsyth v. Univ. of Alabama Bd. of Tr.*, No. 7:17-cv-854, 2018 WL 4517592, at *5 (N.D. Sept. 20, 2018) ("[A]t this stage," a plaintiff "need only plead sufficient facts to allow this court to find it ***reasonable*** that discovery will yield evidence supporting his claim that he was terminated solely because of his disability.").

## III.   Plaintiff adequately pleads a due process claim (Count III).

Section 1983 "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" that subjects the plaintiff to a deprivation of his constitutional rights. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010); *see also* 42 U.S.C. § 1983. To state a claim for supervisory liability, a plaintiff must allege an "affirmative link" between the defendants and the alleged constitutional injury, meaning: "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Dodds*, 614 F.3d at 1195.

The District Defendants challenge the "personal involvement" prong and, in the alternative, claim that they are entitled to qualified immunity. Mem. 27-33. Accordingly, A.Z. does not address the causal connection between Defendants' failures and the constitutional violation or the requirement that defendants act with deliberate indifference, as any arguments regarding these elements have been forfeited or waived. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").[4]

---

[4] Likewise, A.Z. does not address the due process claim against Alpine School District, as opposed to the due process claim against the Individual District Defendants, since the claim against Alpine School District is not the subject of the motion to dismiss.

### A.  The Individual District Defendants had policy-making and supervisory authority.

The Tenth Circuit has emphasized that personal involvement "does not require direct participation." *Dodds*, 614 F.3d at 1195. It is enough for a plaintiff to allege "a supervisor's personal direction or knowledge of and acquiescence in a constitutional violation." *Id.* at 1196 (citing cases); *see also Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008) (noting that "[a]ny official who 'causes' a citizen to be deprived of her constitutional rights" can be held liable under § 1983) (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). Because the facts alleged support a reasonable inference that Burke, Hayes, and Turner knew of an ongoing practice of abuse and were personally involved in the continuation of that practice, the complaint adequately pleads supervisory liability claims against these Defendants.

The District Defendants argue that the complaint fails to adequately plead Turner's personal participation because it makes "no allegations" that he had "any obligation to promulgate policy whatsoever" or "any responsibility to implement policy on school buses." Mem. 28. Not so. The complaint states that as the Special Education Director for elementary schools in the District's "Central Area," Turner was "responsible for implementing special education policies" at A.Z.'s school. Am. Compl. ¶ 18. Construing the allegations in the light most favorable to A.Z., this duty includes policies related to the transportation of special education students. *See, e.g., Felts v. Bd. of Cnty. Comm'rs*, No. 13-cv-1094-MCA, 2015 WL 13665458, at *12 (D.N.M. Mar. 30, 2015) (recognizing plaintiff's claim that a sheriff was responsible for determining what training "was or was not necessary for his officers with regard to encounters with the mentally ill" as plausible and denying motion to dismiss).

Turner further argues that A.Z. fails to allege that he "had any supervisory, or even training authority" over Draper and Fryer. Mem. 28. Quoting *Serna v. Colorado Department of*

*Corrections*, Turner states that "failure to supervise is only actionable under § 1983 for a defendant who had a duty to supervise." 455 F.3d 1146, 1154 (10th Cir. 2006). But *Serna* was a summary judgment case. It is reasonable to infer that, as the Elementary School Special Education Director, Turner had supervisory authority over the individuals tasked with transporting elementary school special education students. At the pleading stage, plaintiffs need only allege facts sufficient for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The District Defendants do not dispute that Hayes and Burke—the Director of Transportation and the Director of Special Education, respectively—had supervisory authority. Instead, the District Defendants argue that the complaint does not show Hayes or Burke's personal involvement because it "lump[s]" those Defendants together and proceeds based on "collective allegations." Mem. 29. This argument relies on *Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011), which is clearly distinguishable. In that case, the Tenth Circuit addressed a motion to dismiss filed by the Secretary of Corrections for the State of New Mexico. The *Brown* complaint's only explicit reference to the secretary alleged that he was responsible for "notifying sex offenders of their duty to register and administering sex-offender registration and probation programs." *Id.* at 1165. Without more, the complaint then accused all "defendants"—including fifty John Doe defendants—of directing plaintiff to register and serve probation as a sex offender. Because the complaint "d[id] not specifically allege how [the secretary] acted in Mr. Brown's case or even that he knew about" the issue, it did not meet the supervisory liability standard. *Id.* at 1165–66.

By contrast, the complaint here does allege specific facts showing that both Burke and Hayes personally were informed of and participated in A.Z.'s case. The complaint alleges that Burke and Hayes were responsible for hiring, supervising, and training Draper and Fryer. The

-13-

complaint further alleges that the Zolmans contacted Hayes and Burke on February 16, 2022, to apprise them of the situation on the bus. Am. Compl. ¶ 48. In response, Burke acknowledged that Draper and Fryer had acted inappropriately and needed further training. *Id.* ¶ 49. He also assured the Zolmans that, despite this behavior, Draper and Fryer could be trusted to work with special needs students like A.Z. *Id.* ¶ 50. Moreover, it was Hayes and Burke who eventually permitted the Zolmans to review video footage of A.Z. being abused on the bus—footage they themselves had already seen and minimized—and both Hayes and Burke were present for the review. *Id.* ¶¶ 64, 67. Hayes and Burke's control over the bus videos further supports the reasonable inference that each of these defendants was directly and personally involved.

### B. Qualified immunity does not apply.

The District Defendants argue that even if Burke, Hayes, and Turner's conduct was unconstitutional, the illegality was not "clearly established" such that qualified immunity should apply. When a defendant raises qualified immunity in a motion to dismiss, courts employ a two-part test, asking "whether the facts that a plaintiff has alleged [] make out a violation of a constitutional right" and "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 732 (10th Cir. 2011). The District Defendants contest only the second prong of this analysis here. *See* Mem. 29 ("For the purposes of this Motion, Individual District Defendants analyze only the 'clearly established' prong of qualified immunity . . . ."). Whether a right is "clearly established" is an objective test that asks "whether it would be clear to a reasonable [actor] that his conduct was unlawful in the situation he confronted." *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010) (quotation omitted). "Because they turn on a fact-bound inquiry, qualified immunity defenses are

typically resolved at the summary judgment stage rather than on a motion to dismiss." *Thompson v. Ragland*, 23 F.4th 1252, 1256 (10th Cir. 2022).

The District Defendants argue first that it was not clearly established that their actions would subject them to constitutional liability under the state-created danger doctrine. Mem. 30. But A.Z. is not pursuing a state-created danger claim, so this is irrelevant.[5]

The District Defendants also argue that it was not clearly established that "the patterns of behavior alleged" in the complaint "suffice to put the Individual District Defendants on notice" of their liability for failure to train. Mem. 30-32. That sounds like an argument challenging whether there was a constitutional violation, even though the District Defendants claim to address only the second prong of the qualified immunity test, *i.e.*, whether the right at issue was clearly established. Regardless, as explained above, the complaint offers a robust set of allegations concerning the District Defendants' actual knowledge of the need to intervene to protect children like A.Z. *See infra* pp. 6–7. For decades, it has been clearly established that supervisors who fail to train, or acquiesce in, unconstitutional conduct by a subordinate are subject to liability. *See, e.g., Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1251-42 (10th Cir. 1999) ("it has been clearly established since at least 1992 that a person who exercises the state's supervisory authority may be held liable for consciously acquiescing" in unconstitutional conduct); *see also Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (when "a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact,

---

[5] Draper and Fryer were acting within the scope of their employment with the District when they violated A.Z.'s rights. *See* Am. Compl. ¶¶ 19-20. The state-created danger doctrine "does not apply when the injury occurs due to the action of another state actor." *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006). Rather, the doctrine subjects state actors to liability if they affirmatively place an individual in danger from a private third-party. *See Gray v. Univ. of Colorado Hosp. Auth.*, 672 F.3d 909, 927-28 (10th Cir. 2012).

the inadequacy of training may serve as the basis for § 1983 liability"); *A.B. ex rel. B.S. v. Adams-Arapahoe 28J Sch. Dist.*, 831 F. Supp. 2d 1226, 1247-48 (D. Colo. 2011) (rejecting qualified immunity defense at summary judgment, where school principal plausibly "failed to adequately train and supervise" subordinate or act on complaints regarding a teacher's use of a restraint chair).[6]

Nor does it matter whether there are decisions involving the precise fact pattern of this case. After all, "there will almost never be a previously published opinion involving exactly the same circumstances." *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In reversing a grant of qualified immunity, the Tenth Circuit has said that its prior cases holding that "other supervisory municipal employees may be held liable under the Fourteenth Amendment for deliberate indifference to the discriminatory conduct of third parties" were "sufficient to make apparent the unlawfulness of such deliberate indifference by a school employee exercising supervisory authority over students." *Murrell*, 186 F.3d at 1251. That is what the complaint alleges here.

Last, the District Defendants argue that it was not "clearly established" that any district policies or practices were unconstitutional. Mem. 32-33 (citing *Dodds*, 614 F.3d at 1198-99). But the *Dodds* case rejected a qualified immunity argument, holding on summary judgment that government officials were not entitled to qualified immunity for unconstitutional policies or practices that they promulgate, implement, or maintain. *See Dodds*, 612 F.3d at 1207 ("[C]ases of

---

[6] The District Defendants argue that *Sutton*'s "controlling value" is "diminished" because it pre-dated *Twombly* and recent Supreme Court qualified immunity decisions. Mem. 32-33. But the *Twombly* standard has nothing to do with qualified immunity and the District Defendants do not explain what part of the Tenth Circuit's analysis is no longer good law. Moreover, even if a Tenth Circuit decision's rationale has been undermined by subsequent decisions—not the case here—this Court still must follow the Tenth Circuit decision unless the Tenth Circuit overrules it. *FDIC v. Aviano*, 184 F. Supp. 3d 1276, 1286 n.9 (D. Utah 2016).

ours and the great weight of authority from other circuits clearly established by 2007 that officials may be held individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights."). The District Defendants' immunity bid is foreclosed by Tenth Circuit law.

Again conflating the "clearly established" inquiry with the plausibility of the underlying violation—a prong the District Defendants supposedly do not challenge—the District Defendants briefly assert that the complaint's "conclusory claim" about a "practice of abuse" is insufficient. Mem. 32 (citing motion to dismiss opinion in *Derosier v. Balltrip*, 149 F. Supp. 3d 1286 (D. Colo. 2016)). Even if the Court were willing to overlook the District Defendants' express waiver of the argument, *Derosier* is plainly distinguishable. There, the plaintiff made only conclusory allegations of arrest pursuant to an unconstitutional policy, custom, or practice of arresting individuals in their homes without obtaining a warrant or establishing an exception to the warrant requirement. *See id.* at 1296. Here, the complaint alleges specific facts demonstrating the existence of a "policy or practice whereby District personnel and agents with responsibility for providing disabled children in the District various services, including transportation services, abused their positions of power and physically abused or mistreated the disabled children in their care," and which the District Defendants "tolerated . . . , thereby encouraging the very type of misconduct at issue in this case." Am. Compl. ¶¶ 119, 124; *see also id.* ¶¶ 50-52, 69, 77-86; *see also* pp. 6-7 *infra*.

## IV.   Plaintiff adequately pleads an excessive force claim (Count IV).

The Fourth Amendment prohibits unreasonable searches and seizures by government officials, including public school officials. *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003). The District Defendants argue that the Fourth Amendment's prohibition of unreasonable seizures "does not apply in school settings where excessive force was used on a student." Mem. 33. As shown below, however, the Tenth Circuit has

clearly indicated that such a claim may be cognizable, and there is no reason to foreclose a Fourth Amendment claim at this early stage.

### A.  Circuit precedent permits excessive force claims in school discipline cases.

The Tenth Circuit has repeatedly recognized that the Fourth Amendment's prohibition on unreasonable seizures applies to school discipline. In *Couture v. Board of Education of Albuquerque Public Schools*, 535 F.3d 1243 (10th Cir. 2008), for example, the court explained that "[t]o qualify as a seizure in the school context, the limitation of the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance." *Id.* at 1251; *see also Ebonie S. v. Pueblo School District 60*, 695 F.3d 1051, 1057 (10th Cir. 2012) (same); *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) ("We believe that the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases.").

The District Defendants rely heavily on *Muskrat v. Deer Creek Public Schools*, 715 F.3d 775 (10th Cir. 2013), which noted "it is not settled law that the Fourth Amendment applies in school discipline cases." *Id.* at 791-92. However, the *Muskrat* panel recognized that *Couture* "appl[ied] a Fourth Amendment standard to school discipline" and "suggests that the Fourth Amendment standard might also apply" to the facts in *Couture*, in which the plaintiff alleged physical abuse. *Id.* Though the panel questioned whether the Fourth Amendment was the proper vehicle for an excessive force claim in a school discipline case, the Court did not overturn *Couture*. *Id.* The court did not decide the issue because, unlike here and in *Couture*, the plaintiff in *Muskrat* did not assert the Fourth Amendment claim until post-judgment motions. *Id.* at 791.

Apart from *Muskrat*, the District Defendants point to four other cases in which courts analyzed excessive force claims against school officials under the Fourteenth, rather than the

Fourth, Amendment. *See Ingraham v. Wright*, 430 U.S. 651, 653 (1977); *Harris v. Robinson*, 273 F.3d 927, 930 (10th Cir. 2001); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1256 (10th Cir. 1996); *Garcia ex rel. Garcia v. Miera*, 817 F.2d 650, 653 (10th Cir. 1987). But none of those cases discussed whether a Fourth Amendment claim could also be viable. In *Abeyta* and *Harris*, the defendants did not use physical force against plaintiff, so a Fourth Amendment claim plainly would have been inappropriate. And in *Ingraham*, the Supreme Court expressly noted that "Petitioners d[id] not contend that the Fourth Amendment applies, according to its terms, to corporal punishment in public school." 430 U.S. at 673 n.42.

That leaves the Defendants with one more case, *Gottlieb ex rel. Calabria v. Laurel Highlands School District*, 272 F.3d 168 (3d Cir. 2001). But not only does that case precede *Couture* and *Muskrat*, it is out-of-circuit and nonprecedential. If the Court is inclined to look to other circuits, several have held that a school official's seizure of a student can be analyzed under the Fourth Amendment. *See, e.g.*, *Doe v. Hawaii Dept. of Educ.*, 334 F.3d 906, 909 (9th Cir. 2003) (holding plaintiff's excessive force claim against school official who taped him to a tree "is appropriately brought under the Fourth Amendment, not the Due Process Clause"); *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir. 1995) (holding that seizure of a student by a teacher or administrator violates the Fourth Amendment "when the restriction of liberty is unreasonable under the circumstances then existing and apparent"); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1079 (5th Cir. 1995) (noting that seizures of students "by or at the direction of school officials . . . are subject to the limitations of the fourth amendment").

**B.  The District Defendants do not have qualified immunity.**

The District Defendants alternatively argue that, because it is not settled whether the Fourth Amendment applies to these facts, they are entitled to qualified immunity. Mem. 37. That

misconstrues the qualified immunity doctrine, which does not permit government officials to claim immunity based on technical disagreements about the applicable legal theory.

To refute a qualified immunity defense, a plaintiff must show that the official's conduct violated clearly established constitutional or statutory rights. *See Kisela v. Hughes*, 584 U.S. 100, 104 (2018). The focus of the inquiry, however, is not the specific constitutional or statutory provision at issue but whether the official had "fair notice that her conduct was unlawful." *Id.* (citing *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam)). Thus, the question here is not whether the District Defendants' conduct was clearly unlawful under the Fourth Amendment specifically, but whether the District Defendants had notice that their conduct was unlawful *in general*. *See Bryant v. Jones*, 575 F.3d 1281, 1309 (11th Cir. 2009) (holding that defendants were not immune from suit on Title VII or § 1981 claims, even though the right at issue was only clearly established under Title VII, because qualified immunity precedent "makes clear that a right may be clearly established irrespective of whether courts have specifically deemed the cause of action as being available under a particular legal theory").

For this reason, courts have rejected qualified immunity defenses that, like the one made here, rested on supposed confusion as to whether the Fourth Amendment or some other constitutional amendment applies. As the Sixth Circuit has explained, for example, "even if there were some lingering ambiguity as to whether the Fourth or the Fourteenth Amendment applies in this precise context, the 'legal norms' underlying [the] claims nevertheless" are "clearly established." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009). The Tenth Circuit explicitly "agree[s] with the Sixth Circuit's analysis" of the "Fourth or Fourteenth Amendment issue." *Estate of Booker v. Gomez*, 745 F.3d 404, 428 (10th Cir. 2014). As *Harris* and *Booker*

squarely hold, disagreement about whether the Fourth or Fourteenth Amendment (or both) provide the relevant analytical framework is not a basis for qualified immunity.

## V.      Plaintiff adequately pleads a failure to intervene claim (Count V).

To state a failure-to-intervene claim, a plaintiff must allege "that (1) a government officer violated his constitutional rights, (2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and (3) the defendant had a realistic opportunity to intervene, but failed to do so." *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022). A.Z. alleges that Draper and Fryer violated his Fourth and Fourteenth Amendment rights by repeatedly abusing him physically and emotionally. Am. Compl. ¶¶ 107, 117-18. He alleges that Burke, Hayes, and Turner knew of the ongoing constitutional violations because they reviewed video footage showing Draper and Fryer's repeated abuse. *Id.* ¶ 52. And he alleges that Burke, Hayes, and Turner had a realistic opportunity to stop the abuse because they were supervisors and senior officials who could have required greater supervision and discipline, terminated or suspended Draper and Fryer, or at least informed the Zolmans about the abuse after they saw it so that they could protect their son themselves. *Id.*

The District Defendants' counterarguments are meritless. First, based on their contention that the Fourth Amendment "does not apply to uses of force by school officials," the District Defendants contend that failure-to-intervene claims are limited to law enforcement officials. Mem. 38. In reality, the Tenth Circuit has recognized that Fourth Amendment excessive force claims are cognizable against school officials, *Couture*, 535 F.3d at 1251, and failure-to-intervene claims can be brought against any "government officers." *Bledsoe*, 53 F.4th at 616.

Second, the District Defendants argue that an official needs to be physically present for the constitutional violation. Mem. 39. But a plaintiff needs only to allege that a defendant "ha[d]

reason to know" that the constitutional violation was being committed and failed to intercede. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008). Here, the complaint alleges that Defendants were aware of the ongoing constitutional violations over a period of months and, therefore, had a reasonable opportunity to intercede and prevent the harm to A.Z. *See Bledsoe*, 53 F.4th at 616 (holding plaintiff stated failure-to-intervene claim with allegations that defendants "knew of the ongoing constitutional deprivations," which "unfolded over months" and gave defendants a "reasonable opportunity to intervene").

Third, the District Defendants state in passing that the underlying right was not "clearly established" under the Fourth Amendment, echoing their earlier qualified immunity arguments. Mem. 39; *see also id*. at 38 ("Counsel for the District Defendants could not find a Tenth Circuit case in which a Fourth Amendment failure-to-intervene claim was stated against a school official for failing to prevent violence or abuse caused by a school employee."). As explained above, Tenth Circuit case law squarely forecloses the Fourth- versus Fourteenth-Amendment qualified immunity argument. *Gomez*, 745 F.3d at 428. Plaintiff therefore properly stated a failure-to-intervene claim.

## CONCLUSION

For the foregoing reasons, this Court should deny the District Defendants' Partial Motion to Dismiss in its entirety.

Dated: May 13, 2024                    Respectfully submitted,

/s/ *Howard Kaplan*

Howard Kaplan (pro hac vice)
Sarah Grady (pro hac vice)
Jed W. Glickstein  (pro hac vice)
KAPLAN & GRADY LLC
2071 N. Southport Ave., Ste. 205

Chicago, IL 60614
(312) 852-2184
howard@kaplangrady.com
sarah@kaplangrady.com
jglickstein@kaplangrady.com

J. Ryan Mitchell (9362)
Mika Hillery (18414)
MITCHELL BARLOW & MANSFIELD, P.C.
9 Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
rmitchell@mbmlawyers.com
mhillery@mbmlawyers.com

*Attorneys for Plaintiff*